IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MOLLY BRADO,** *et al.* | \* | |
| | \* | |
| Plaintiffs, | \* | |
| | \* | |
| v. | \* | Civil No. **PJM 07-2696** |
| | \* | |
| **JERRY WEAST,** *et al.* | \* | |
| | \* | |
| Defendants. | \* | |

**OPINION**

Robert and Ann Brado, as parents and next friends of Molly Brado (the "Brados"), challenge the conclusion of an Administrative Law Judge (ALJ) that, as a student in the Montgomery County Public School (MCPS) system, Molly was ineligible for special education and services under the Individuals with Disabilities Education Improvement Act (IDEA). 20 U.S.C. §§ 1400-1450 (2004). The Brados seek reimbursement for the expense of private teachers they have arranged for Molly since the fall of 2006.

The parties have filed cross motions for summary judgment. For the following reasons, the Court **DENIES** the Brados' Motion and **GRANTS** the Cross Motion of MCPS.

**I.**

**A.**

The essential facts are not in dispute:

Since the age of 3 or 4, Molly, now age 18, has suffered from a medical condition that causes her to experience severe pain throughout her entire body. Although she has received treatment for this condition since the onset of her symptoms, doctors have had difficulty arriving

1

at an accurate diagnosis.  At different times, she has been diagnosed with Juvenile Rheumatoid Arthritis, Reflex Neurovascular Dystrophy (RND), and Postural Orthostatic Tachycardia Syndrome (POTS).  As of June 2008, her diagnosis was POTS.

From the end of Molly's sixth grade year, when a MCPS Educational Management Team (EMT) found her eligible for accommodation under Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), she was provided with special services to accommodate her pain.  29 U.S.C. §§ 701-7961 (2000).  Specifically, MCPS arranged for her to have an adjusted workload, a set of books to keep at home, and extended time for tasks.  From June 2003 until March 2005, while attending Frost Middle School, Molly was apparently able to function with these accommodations.  In March 2005, however, in her eighth grade year, Molly stopped attending school due to the severity of her pain.  Within days, MCPS provided her with a Home and Hospital Teaching (HHT) program, which included 6 hours of instruction per week covering the subjects of English, social studies, mathematics, and science.  The Brados, dissatisfied with the level of HHT instruction, sought and obtained a due process hearing before the Maryland State Board of Education (MSBE).  The ALJ who heard the case found that Molly was entitled to dual enrollment in both day school and HHT, in consequence of which she was provided with 15 hours per week of HHT instruction.  Despite the dual enrollment, Molly did not return to school but remained at home with HHT instruction for the remainder of her eighth grade year.

In June 2005, an Individualized Education Program (IEP) team was convened to assess Molly's educational needs and to develop an IEP for the 2005-2006 school year.  The team, consisting of members from Frost Middle School, Wootton High School (where Molly would be entering the ninth grade), and the Brados, determined that Molly was eligible for special education and related services under the IDEA.  The team thus arrived at an IEP that provided

Molly with various aids and services including an adjusted workload, supervised breaks during exams, the spreading out of single day tests over a period of multiple days, special seating, the use of a computer, a set of books for use at home, one period per day in the resource room, and continued services from HHT.  The sole objective stated in the IEP was for Molly to improve her ability to meet academic standards.

Molly attended Wootton High School for less than a week, then returned home, where she completed her ninth grade studies through HHT.  She never returned to school during the school year.  In February 2006, still dissatisfied with the level of HHT Molly was receiving, the Brados again sought a hearing with the MSDE, alleging that MCPS had failed to develop and implement an IEP that appropriately addressed Molly's needs.   Meanwhile, Molly continued her HHT instruction.  The IEP team was set to reconvene in June 2006 to develop Molly's IEP for 2006-2007.

Prior to the June 2006 meeting, Molly underwent educational, psychological, and psychiatric evaluations. JeanMarie Joseph, a Wootton High School resource teacher for special education, conducted an educational evaluation and found that all of Molly's scores were in the average range. Frieda S. Paskow, a Nationally Certified School Psychologist at Wootton, conducted psychological testing and found that, although most of Molly's scores were in the average range, she exhibited weak mental control, lower than average ability to process simple visual material, and below median skill in processing speed tasks.  Ms. Paskow opined that Molly's educational difficulties were caused by her medical problems.  Dr. Wanda Foxx, Molly's primary care doctor, submitted a report stating that Molly suffered from chronic severe pain and emotional stress stemming from her pain and the lack of an appropriate educational environment and would, therefore, most likely require homebound instruction for the 2006-2007

3

school year.  Dr. Phyllis J. Heffner, Molly's attending psychiatrist at the Children's National Medical Center (CNMC), submitted a report stating that, because of her pain, Molly was unable to consistently attend and participate in many activities, and that her concentration and ability to complete tasks were compromised.

The June 2006 IEP team reviewed Molly's educational and psychological assessments, including information from Molly herself regarding her educational, medical, and psychological issues, and took into account the Brados' opinion that Molly was not prepared to return to Wootton.  The team found that Molly continued to be eligible for special education and related services and accordingly developed an IEP providing that she would continue to receive 15 hours per week of HHT, to be adjusted as needed.  The team scheduled another meeting for August 2006 to establish Molly's goals and objectives for the upcoming school year but, for reasons not clear from the record, that meeting was inconclusive and the team did not complete this task.

In September 2006, MSDE responded to the Brados' February 2006 complaint. It concluded that both Molly's 2005 and 2006 IEP's were incomplete and ordered the IEP team to reconvene, review all existing data, and take all other necessary steps to develop an appropriate IEP.  As a result, the team reconvened, reviewed the reports based on Molly's summer assessments, and reports from seven HHT teachers.  The reports from the HHT teachers noted that Molly was a capable student but that she required frequent breaks, rephrasing, and simplified directions.  According to one teacher, Molly had difficulty concentrating due to her fatigue.

In November 2006, the reconvened IEP team concluded that Molly did <u>not</u> require special education and was no longer eligible for services under the IDEA.  The Brados appealed this decision to the Office of Administrative Hearings (OAH).  Shortly thereafter, Molly was admitted into the Children's Hospital of Philadelphia (CHOP) for treatment of her pain and

psychological problems, where she remained from November 27, 2006 until December 21, 2006. After leaving CHOP, Molly did not return to Wootton but continued to obtain HHT instruction at her parents' expense.

**B.**

The administrative law judge (ALJ), reviewing the November 2006 IEP, heard 10 days of testimony and received some 120 exhibits. He considered the testimony of thirteen educator witnesses—including special education experts, school supervisors, schools counselors, and three of Molly's HHT teachers. He also reviewed five medical expert recommendations as well as information included in Molly's 2005 and 2006 IEP determinations. He concluded that, to be eligible for special education services under the IDEA, the Brados needed to demonstrate that Molly was a child with health impairments who, as a result, needed special education and related services. The ALJ noted that special education is limited to specially designed instruction that addresses the unique needs of the child.

The ALJ observed that all the HHT teachers testified that Molly was a capable student who did not require adaptation in content, methodology, or delivery of her curriculum. The ALJ further noted that, except for Molly's mother, Ann Brado, who testified as a special education expert, all the educator witnesses testified that Molly required only accommodations, not special education. The medical expert reports in particular indicated that Molly did not require HHT but that she should return to school with accommodations. Except for one of the three letters submitted by Dr. Foxx, no medical expert suggested that Molly required HHT. The ALJ thus concluded that, because they were significantly flawed, the June 2005 and August 2006 IEP's should carry little weight in assessing Molly's educational needs. On the basis of the testimony

and exhibits he himself reviewed, the ALJ determined that Molly did not require special education.

The Brados challenge that finding. They argue that the ALJ "misunderstood and misapplied" the definition of "special education" and therefore erred in finding Molly ineligible for services under the IDEA. They also argue that MCPS discriminated and retaliated against them in denying Molly HHT. They request that the Court admit additional evidence at this juncture. Ultimately they seek reimbursement for the private tutoring they provided to Molly at their own expense following the November 2006 IEP determination.

## II.

In *Board of Education v. Rowley*, the Supreme Court held that, in reviewing administrative decisions in cases under the IDEA, the district court must make an independent decision based on a preponderance of the evidence, while giving due weight to the state administrative proceedings. 458 U.S. 176, 206 (1982). In *Doyle v. Arlington County School Board*, the Fourth Circuit elaborated on the "due weight" requirement. 953 F.2d 100, 105 (4th Cir. 1992). Due weight must be accorded to the findings of fact of the hearing officer, which are entitled to a presumption of prima facie correctness, while the district court, if it is not going to follow those findings, must explain why. *Id*. The district court may consider the entire record developed below as well as additional evidence presented in the district court itself. 20 U.S.C. § 1415(i)(2)(c).

## III.

The Court considers first the Brados' central claim—that the ALJ, by applying an improperly narrow definition of "special education," wrongly held Molly ineligible for special education and related services under the IDEA.

According to the statute, "special education" is "specially designed instruction, at no cost to parents to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29). Specially designed instruction includes "instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings." *Id*. This definition covers not only the content of the instruction but also the method of delivery. *Weixel v. Bd. of Educ. of New York,* 287 F.3d 138, 150 (2d Cir. 2001) (finding that a child's need for in-home instruction in itself constituted special education under "even the most conservative" reading of the statute). The IDEA "does not include any requirement that the instruction administered in these alternative settings must be altered in either content or form to constitute 'special education services.'" *Bd. of Educ. of Montgomery County v. S.G.*, No. 05-00323 (DKC), 2006 WL 544529, at *14 (D. Md. March 6, 2006), *aff'd*, 230 F. App'x 330, 333 (4th Cir. April 25, 2007). However, many children who do not qualify for services under the IDEA are nonetheless eligible for "accommodations" under Section 504 of the Rehabilitation Act. 29 U.S.C. § 794. Section 504 prohibits discrimination against otherwise qualified disabled persons under any program or activity receiving federal financial assistance. *See* 29 U.S.C. § 794. To comply with the statute, MCPS must provide reasonable accommodations for handicapped students. *Id*. These accommodations can include an adjusted workload, simplified instructions, modified testing procedures, and extended time on tests and other assignments.

In arguing that the ALJ erred by failing to apply a broad definition of "special education," the Brados contend that he failed to include HHT in his definition. They compare Molly's situation to that of the schizophrenic child in *Board of Education of Montgomery County v. S.G.*, whose need for a therapeutic environment was deemed to constitute "special education." *S.G.*, 2006 WL 544529, at *14 (D. Md. March 6, 2006).

7

MCPS submits that the ALJ in fact did include HHT in his definition of "special education"; what he held, it says, is that Molly did not require such service. MCPS points out, for instance that, unlike the evidence in *S.G.*, the present record contains no persuasive psychiatric testimony justifying Molly's need for education in an alternative environment. While MCPS concedes that a genuine need for HHT might constitute IDEA eligibility, it argues that the Brados have not satisfied their burden of proving that need. MCPS also argues that the Brados' reliance on the 2005 and 2006 IEP determinations of IDEA eligibility cannot suffice to carry the day.

The Court agrees with MCPS and the ALJ. Molly, to be sure, suffers from chronic pain and fatigue which likely inhibit her ability to concentrate and to complete tasks. The record is clear as to her need for frequent breaks, adjusted workloads, alternative test scheduling, and personalized instruction. The point, however, is that these modifications to Molly's instruction can all be obtained through Rehabilitation Act accommodations. 29 U.S.C. § 794. Both the medical expert testimony as well as the educator testimony, as reviewed by the ALJ, indicate that Molly requires only accommodations. Not one HHT educator witness testified that Molly required special education. Nor did the psychological or the educational assessments that Molly underwent in 2006 indicate a need for HHT. While the medical doctors and psychologists all agree that Molly suffers from some sort of pain disorder, with the exception of Molly's primary care physician, Dr. Foxx, no medical expert suggests that Molly required HHT. Although Molly may have been provided with HHT for two years, the record does not establish that the earlier determinations by the IEP teams were well grounded.[1]

---

[1] There is no indication in the record that the 2005-2006 IEP team based its decision on any expert assessments, evaluations, or recommendations. The record states that the team simply determined that Molly did not require a "re-evaluation." At some point in June 2005, however, Dr. Wanda Foxx, a National Naval Medical Center (NVMC)

The Court would note that included in the IDEA's regulations for development of a child's IEP is a mainstreaming objective. The Act also requires that each child be placed in the "least restrictive environment." 20 U.S.C. § 1412(5). The "least restrictive environment" for Molly in this case was in school, where her needs could be met pursuant to the Rehabilitation Act. HHT was not required. Consequently, the Court finds Molly ineligible for special education and related services under the IDEA.

## IV.

The Brados' assert that MCPS "discriminated and retaliated against the Brado family" by modifying its assessment of Molly's IDEA eligibility. They cite the total about-face stance taken by the IEP team and its utilization of unconventional forms as evidence of this retaliation. MCPS counters that any claim of retaliation or discrimination is not properly before the Court since no such claim was raised before the ALJ. The Court agrees with MCPS.

It is well settled that, when reviewing decisions of administrative agencies, a reviewing court may not consider issues presented to it in the first instance. A "court will review an adjudicatory agency decision solely on the grounds relied upon by the agency." *Dept. of Health v. Campbell*, 364 Md. 108, 123, 771 A.2d 1051, 1060 (2001). In the context of IDEA cases, the court's limited jurisdiction "permits review of factual findings and legal determinations by an ALJ, but does not generally permit consideration of the substantive merits of IDEA claims in the first instance." *Mayo v. Baltimore Pub. Sch.*, 40 F. Supp. 2d 331, 333 (D. Md. 1999). Since the

---

staff pediatrician, recommended to MCPS that Molly receive concurrent instruction in school and at home due to her frequent absences and inability to concentrate caused by her illness.

Brados failed to raise a claim of either discrimination or retaliation before the ALJ, they may not raise the claim before this Court.[2]

## V.

Finally, the Court considers the Brados' request that the Court admit additional evidence at this juncture.

The IDEA provides that, in any action challenging the results of a due process hearing, the reviewing court "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii). Such "additional" evidence, however, must consist of new and different "supplemental" evidence; it may not merely "embellish" information already reviewed in the administrative hearing. *Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659, 667 (4th Cir. 1998) (adopting the definition set forth by the First Circuit in *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 790 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985)). In *Springer*, the Fourth Circuit explained that the "additional" evidence must not have been available at the time of the due process hearing and must not be so broad that the due process hearing becomes "a mere dress rehearsal by allowing appellants to transform the Act's judicial review mechanism into an unrestricted trial de novo." *Springer*, 134 F.3d at 667. The purpose of limiting additional evidence in the district court is to prevent the derailing of the IDEA procedural safeguards set in place by Congress. *Schaffer v. Weast*, 554 F.3d 470, 476-78 (4th Cir. 2009) (finding that the admission of additional evidence can weaken the IDEA's procedural safeguards and is thus left to the reviewing court's appropriate discretion). Under the IDEA, IEP's are developed through a complex process involving educators, experts, and families and must, at a minimum, be reviewed annually. 20 U.S.C. § 1414. Allowing judicial review of IEP's after casual reliance on post-

---

[2] Notwithstanding the inappropriateness of reviewing claims not presented to the ALJ, the Court would find the retaliation claim without merit. MCPS has provided valid reasons for its decision based upon educational, psychological, and medical expert reports and opinions.

10

hearing evidence would create a "strong disincentive" against local review and revision of IEP's. *Schaffer*, 554 F.3d at 477 (explaining that if IEP determinations were subject to constant court review based on new information, school districts would be less inclined to ensure accurate updates). The district court must assess the admissibility of additional evidence with an eye on upholding the goals and mechanisms of the IDEA.

The Brados seek to admit (1) expert letters from medical doctors who have treated Molly since the ALJ's decision with respect to the November 2006 IEP, (2) MCPS forms that have been issued since the hearing, and (3) copies of the Brados' correspondence with MCPS relating to their post-hearing attempts to obtain HHT for Molly. The Brados argue that the Court is statutorily bound to consider additional relevant evidence and that the evidence they have submitted is both relevant and admissible. MCPS believes that the additional evidence is cumulative at best and, moreover, fails to comply with federal procedural rules on motions for summary judgment.

The Court finds no reason to receive the proffered evidence. Notwithstanding Molly's "new" diagnosis that she suffers from POTS, the doctors' letters are not markedly different from the letters of the medical experts introduced in the administrative hearing. Her symptoms remain largely the same and her educational needs in light of her POTS diagnosis do not differ from what they were under her prior diagnoses. In the Court's view, the proffered letters fall squarely within that category of evidence that embellishes evidence already reviewed by the ALJ. *See Springer,* 134 F.3d at 667. As for the MCPS forms and the Brados' correspondence with MCPS, the Court finds them to be irrelevant. These materials relate only to the Brados' retaliation claim, which has just been dismissed.

## VI.

For the foregoing reasons, the Brados' Motion for Summary Judgment is **DENIED**.

MCPS' Cross Motion for Summary Judgment is **GRANTED**.

A separate Order will **ISSUE**.

                                      /s/
                       **PETER J. MESSITTE**
          **UNITED STATES DISTRICT JUDGE**

**January 22, 2010**